IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

UNITED STATES OF AMERICA,

Plaintiff

v.                                                           CRIMINAL 06-0174 (JAG)

[1] JOSÉ LUIS ALICEA COTTO,
[2] BENNY ALVARADO ARROYO,
[3] CRISTIAN AYALA GARCÍA,

Defendants

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

### I.  FACTUAL AND PROCEDURAL BACKGROUND

On June 1, 2006, the defendants were indicted by a grand jury.  The indictment consists of seven counts.  In the first count, defendants Alicea Cotto and Alvarado Arroyo are charged with knowingly and unlawfully possessing a  stolen firearm, that is, a Smith & Wesson, serial number VCU9954, Model No. 5906, loaded.  In the second count, Ayala García is was indicted for a violation of 18 U.S.C. § 922(k).  Specifically, the indictment charges this defendant with knowingly and unlawfully possessing a firearm, that is, a Ruger Model P89, which had an obliterated serial number.   Count Three charges the three with knowingly and unlawfully possessing with intent to distribute about 56 decks of heroin.   Count Four similarly charges possession of 90 capsules of cocaine base. Count Five charges the three similarly with possessing 44 bags of cocaine, and Count Six charges the three with possessing a bag of marijuana.  Count Seven charges Alicea Cotto with

CRIMINAL 06-0174 (JAG)                    2

knowingly possessing firearms, that is, a 9mm caliber pistol and an AK-47 type rifle, in furtherance of a drug trafficking crime.    In violation of 18 U.S.C. § 924(c)(1)(A)(i) and 18 U.S.C. § 922(j).

On July 5, 2006, co-defendant Alicea Cotto moved to suppress illegally obtained evidence.  (Docket No. 35.)  The motion outlines the facts on which the defendant relies.  On May 25, 2006, at about 4:00 p.m., a number of police officers assigned to the Carolina Drug Unit entered the Sabana Abajo Public Housing Project in Carolina.  Unmarked units and a patrol vehicle arrived later, and a white police van also arrived.  A group of five officers approached about seven people (three of them defendants in this case) who were sitting on stairs in the middle of the project. After the police entry but before the approach, someone fled to the mountainside next to the project, and was unsuccessfully followed by other police.  The seven were told to do the routine, that is, empty their pockets, turn around, spread their legs, and submit to a pat-down.  All were thus searched without incident.  The officers then told them to sit down and remained nearby, making comments.  After a few minutes, the officers who had gone into the mountainside signaled these officers to arrest the seven since they had found a Nike bag with weapons and drugs.  One officer asked the defendants regarding the ownership of a nearby vehicle, a Nissan Armada.  Alicea Cotto said it was his.  An officer then took the key from the defendant and opened it.  Alicea Cotto was taken to the car and the others were taken to the police van, handcuffed.  The Nissan Armada was then searched.  The

CRIMINAL 06-0174 (JAG)                3

result of the search was basically negative.  As Alicea Cotto was led to the police van to be transported to the police station, the other officers placed the black Nike bag containing the firearms inside the vehicle and drove it to the station.  At the station, the drugs and guns were attributed to the defendants herein indicted.  The other individuals were released from custody hours later without charges having been filed.  The three defendants were then handed over to the federal authorities.

The defendant moves to suppress the items seized since his arrest and subsequent search of the vehicle were conducted without probable cause.

The United States opposed the motion to suppress on August 31, 2006. (Docket No. 69.)  It argues that the facts which are in dispute, that is, whether the police observed criminal activity which led to the arrest and seizure, require the questioning the credibility of the police.  The government proposes a completely contradictory factual predicate.  The government's version differs from the defendant's version in that the seven individuals were standing in the vicinity of the Nissan Armada, the engine of which was running.  Alicea Cotto was observed retrieving a semiautomatic pistol from the rear hatch of the SUV, and watched him exchange the pistol for a sum of money with co-defendant Alvarado Arroyo.  The two were then arrested.  Upon inquiry of the group, Alicea Cotto admitted ownership of the Nissan Armada.  An officer recovered a pistol from the waistband of Alvarado Arroyo, and another officer recovered $500 from the right hand of Alicea Cotto. During this exchange, an officer observed a rifle barrel in the rear hatch area.  An

CRIMINAL 06-0174 (JAG)                4

AK-47 was then recovered.  Drugs were found in the right passenger area of the Nissan Armada.  It was determined that Ayala García was a lookout and so the police searched him, recovering a pistol from his pocket.

The United States argues that deference must be given to the police, assuming that things happened in the manner that the police say they did.

An evidentiary hearing was held on the motion to suppress on October 17, 18, 20 and November 2, 2006.

The United States presented the testimony of Police Officer Luis Vega López, who is an agent of Narcotics Unit of Carolina, and has been an officer for six or seven years.  He has received specialized training in narcotics and weapons, including the packaging of narcotics, the importation of drugs, and the recognition of narcotics transactions, as well as the differences in firearms.  In particular, Officer Vega López investigates drug points operating particularly in Carolina, Trujillo Alto, Canóvanas and Loiza..

On May 25, 2006, between 4:00 and  5: 00 p.m., he was driving a Police of Puerto Rico unmarked car with Officer José Miguel Sánchez, assigned to investigate drug points of Carolina.  Sergeant Delgado had told them to enter the Sabana Abajo Public Housing Project to investigate and to see if the drug point was operating.

The officer explained that there are drug points operating in the north and south areas of the housing project, the south point being a movable on.  The housing project is divided by Monserrate Avenue, the division being north and south, to the

CRIMINAL 06-0174 (JAG)                    5

left and right as one is looking toward Canóvanas (which is basically east). Temporary swimming pools are located at times in the basketball court on the south side, near building 11 of the project. The drug points are on the south side of the plaza and buildings 11, 12, and 13, are also located on the south side of the project. The pools would be within 100 feet of the drug points. Although the complex has green areas, outside of the housing project, on the other side of a nine to ten foot high concrete wall, topped with barbed wire, on the south part, there is an area of high grass, overgrown so as to require mowing.

Having been summoned to the housing project on May 25, 2006 to make observations and investigate, Officer Vega, driving an unmarked compact car, and the other officer, drove into the housing project, in plain clothes, and Officer Vega saw, at a distance of about 60 feet, a Pathfinder Armada, terra cotta color with the hatch open, and three people, including co-defendant José Luis Alicea Cotto, with his arm pointing toward the police. In front of Alicea Cotto was co-defendant Benny Alvarado Arroyo about three feet away, right behind the Pathfinder. Next to Benny Alvarado Arroyo was Christian Ayala García. At that moment, Alicea Cotto gave a firearm to Alvarado Arroyo, who put it in his right front pocket of his pants and then gave money to Alicea Cotto. The officers were about 60 feet away and moving on the main entry road at an angle to where the defendants were located. Officer Sánchez said by radio that they were going to intervene. Officer Vega made a left and parked about 12 feet away from them. Since the police had probable cause to arrest

CRIMINAL 06-0174 (JAG)                6

these individuals, they radioed in that they were going to intervene. Other colleagues came (by car) into the housing project within seconds to assist the two officers in the arrests. The two officers got out of the vehicle and, with precaution, arrested the three, who became petrified and did not move. There were several other people sitting on small steps used to throw garbage in the garbage bins, about 15 feet away.

Once the arrest of Alicea Cotto was conducted, the officer seized currency from him in different denominations, about $1,000. Officer Vega saw inside the open hatch area of the Nissan Armada that there was a rifle protruding from under a t-shirt, with the point of the barrel showing, which he later learned was an AK-47. The officer described the weapon which was subject of the transaction as nickle plated. Alicea Cotto said that the vehicle was his, upon questioning. The officer approached the vehicle, and with his torso inside the vehicle, saw the key in the ignition. He also saw in the passenger side of the vehicle on the carpet area, there was a Zip-loc plastic transparent bag, about one foot by one foot, which had several Zip-loc baggies, with apparent cocaine powder. There were also several cylindrical vials with apparent crack cocaine. No one was inside the vehicle. After this occurred, all went to the narcotics drugs division in Carolina. The officer later learned that the vehicle was registered to a leasing company, Popular Auto.

An additional firearm was seized from Christian Ayala García and Benny Alvarado Arroyo (a Smith & Wesson 9mm.) Officer Sánchez arrested Ayala García

CRIMINAL 06-0174 (JAG)                    7

and seized a weapon from him, a Ruger.[1]  Exhibit 9 shows where officers Vega and Sánchez entered the housing project right to the left on the photo, with an arrow pointing in the direction the unmarked car was traveling until it stopped.  The Nissan Armada would not appear in this photo.  The defendants were located outside of the lower right corner of the photo.  Exhibit 6 does not show the hatch window opened.  On May 25, it was opened up.  Exhibit 7 shows the rear area where the AK-47 was seized.  (Marked R for rifle.)  Exhibit 14 shows a "clavo," a hiding place to keep things.  There was nothing incriminating about the "clavo."  Exhibits 11 and 13 is the money seized in the arrest.  Exhibit 10 is evidence seized on that day from that vehicle was an AK-47.  Exhibit 12 shows other seized items.  There was heroin, cocaine, crack cocaine and marijuana in the Zip-loc bag, as well as money in the bag. A field test proved positive for these substances.

On cross-examination, the officer, whose nickname is Beto,  noted that on May 25, 2006, the officers were doing routine investigations and that Sergeant Delgado told them to investigate the south drug  point of the project.  The agents

The defendants were transported to the narcotics division in a white van. They said nothing.  Other people were also arrested but not by Officer Vega.  Those people were not charged.  Alicea Cotto signed a receipt for the money.

On cross-examination, the officer, whose nickname is Beto,  noted that on May 25, 2006, the officers were doing routine investigations and that Sergeant Delgado told them to investigate the south drug  point of the project.  The agents

---

[1]Exhibits 1, 2, 3, are photos of the crime scene.  Exhibit 1 is the scene of the crime.  Exhibit 2 shows another view of the crime scene, and shows where the Nissan Armada was located (with magic marker).  Exhibit 3 does not reflect where the officer was.  He was parked to the left of the photo.

CRIMINAL 06-0174 (JAG)                    8

entered the housing project about four times a month to investigate.  Officer Sánchez
is known as El Chino.  Officer Vega first saw the defendants from the main road in
the housing project.[2]  The transaction occurred in front of the officer, who first saw
it from the corner on the left as one enters the housing project. Alicea Cotto had no
less than $500.  One pistol was in Benny's pocket.  The officer did not see the other
pistol.  Officer Sánchez was around him, while there were other officers in the
perimeter such as Abraham Sánchez.  They were lending assistance as backup since
the residents became uncomfortable when the police arrive.  The officer searched
Alicea Cotto and  nothing was seized.  Officer Sánchez was bringing the others into
the van and other colleagues were lending assistance to place them in the van.
There were nine or ten agents that day lending assistance, all in the same unit.
Some of them were Miguel Sánchez, Abraham Sánchez, José López aka Nerves,
Nervios, Mejicano (a name he received when he worked in Trujillo Norte).  The
officer did not remember the names of the other colleagues. They entered the project
in a compact car, not a Technica.  It was green.  No other police vehicle came in
right after their vehicle.  Rather, they came in (later) marked and unmarked
vehicles, a total of four vehicles.

Alicea Cotto was placed first into the van.  There was no other prisoner in the
van that the officer could recall at that time.  The other two were placed in the van

_____

[2]In Exhibit 9, the ◯ reflects where the officer stopped his car.  Exhibits A and
B show the main road in the south part of the housing  project.  A light van is seen
in Exhibit 9.

CRIMINAL 06-0174 (JAG)                    9

later.  There were two officers in the front of the van.  Officer Sánchez took the other two to the van.  Sergeant Delgado told Officer Sánchez to take the Nissan Armada under escort to headquarters.  At headquarters, there were other people arrested that were placed in the van but the officer never saw when they were placed in the van.  While the others were transported, they were not processed.

Agents María Escobar and Pedro Pérez from DEA later came to the division and they made certain arrangements.  The officer noted that many times residents of the housing project become part of the criminal organization.  Walkie talkies are used, and not all (drug points) have the same modus operandi.  They operate with lookouts sometimes.  When police arrive, they yell "agua," which means they are committing some criminal acts within the housing project.  Agua means police in their jargon.

Officer Vega filled out an incident report in relation to the arrest of Alicea Cotto, and another report related to the Pathfinder vehicle.  That is a statistical report, a PPR126.  There is a place in the incident report which shows money and a white gold chain taken from him.  The same is in the division, wrapped, since it can not be in the cell with the defendant.

Making reference to Exhibits A and B, the officer noted that they entered slowly, perhaps at five or six m.p.h., until they got to the point in Exhibit 9.  There was movement of residents in the area.  He did not hear "agua."  There were little steps close to where the arrestees were.  Four vehicles were there for backup within

CRIMINAL 06-0174 (JAG)                    10

four seconds.  The officer noted that the outside grass is mowed by the municipality.

Sergeant Josué Delgado, his direct supervisor,  gave him instructions while he was in the car on San Marcos Street near the housing project.  It then took him a matter of seconds to get to the scene.

Rosa Reyes Torres, a housewife, who lives in building 12, apartment 101, of the Sabana Abajo Public Housing project, has lived there for 22 years.  On May 25, 2006, she was at home.  Some policemen came into the housing project, by car, three white police cars and a van.  There were some guys sitting on some small stairs, a group of five.  The police went up to them, told them to stand up, searched them, and found nothing.  They then sat down again.  The three arrested people were in that group.  Shown Exhibit K, she noted that it showed the stairs where the guys were when the police approached them.  By building 13, after the police completed their search, one of the officers told them to stay there, and they were then handcuffed.  They then went to a gold colored vehicle.  Looking at Exhibit 1, she pointed out where  she lived, on the left side of the photo, on the second floor.  The van was parked below the second floor (marked with an X).  The police arrested more than five; all the guys there were arrested.  One guy was up against the gold colored van (Nissan Armada), and the witness was on the balcony, twelve feet above the van.  A policeman was next to one guy counting money.  The policeman opened the van.  Nothing was in it.  The van was then closed and the officer went back to the guy.  She heard someone say: "There is nothing here."  Ms. Reyes went inside

CRIMINAL 06-0174 (JAG)                    11

and when she looked again, the police were talking about who would take the van. They handcuffed someone and put him in the white van. They put Alicea Cotto in the van last.

On cross-examination, the witness noted that her son's name is Danny Castro and he is 26 years old. She has been doing housework for 10 years, sometimes for a week, sometimes less. She did not work on May 25, 2006. Maybe a week before she had worked. Making reference to Exhibit I which showed where she lives, there are two sets of steps, similar to each other, which she could see. One set faces away. One set faces the entrance of the housing project and the other faces building 13. Building 13 is perpendicular to the building where she lived.

Ms. Reyes knows one defendant by his nickname Papolo, that is, Benny Alvarado. He lives in the housing project and she knows him since he was a very young boy. She knows Papolo because he went to school with her children and they know each other since they were little. The other two are not childhood friends of he son. She continued to testify that notwithstanding the sidewalk for her building, and the awning, or curtain for the apartment below, her view was not blocked. (See Exhibit 1.) She said that one individual was against the van on that afternoon, that it was José Alicea Cotto, the last one in the van. She said there were three labeled white police cars and a white van, and that the SUV (Nissan Armada) was gold colored, not burgundy.

CRIMINAL 06-0174 (JAG)                    12

Ms. Reyes said that when the police raid, they come two or three only. She testified that the steps were a distance similar to the distance between the witness booth in court and the far corner window (a distance of about 35 feet). She said that the officers searching the van were 13 or 15 feet away, and that she could hear them clearly.

Delibeth Pizarro testified that she lives in building 13, apartment 114, at Sabana Abajo Public Housing Project, and is a home maker. She has lived there for six years. She recalled that on May 25, at 4:30 p.m., she was in front of building 13, with her children in a (portable) pool, the children being ages six, five and two years old. The pool was fifteen feet in diameter and 42" deep. Referring to Exhibits C, D, E, she noted that her apartment is seen on Exhibit C, a ground floor apartment (X). She showed where the swimming pool was on the picture with an X. Exhibit D shows where the pool was and a weeded area. Exhibit E shows the area behind her apartment, to the right side of the picture, and a brush in the back of her apartment.

On May 25, 2006, she saw a Cavalier and a Technica, wine and mint green in color, enter the housing project quickly. They came in front from different directions. Four police officers came out of the Tecnica, with radios in their hands. They intervened with the guys sitting on the steps. (Exhibit K.) The three defendants and four more people were on the stairs. The police turned them around but she could not hear them. The police patted the defendants down, but she could not tell if anything was seized from them. Then, four officers went into the brush,

CRIMINAL 06-0174 (JAG)                    13

quite far into the brush.  Exhibit C shows the brush where cops went (circled).  The agents went passed her.  They found a long, black bag, they yelled: "BINGO!"  She made a cuffing gesture which is what the officer in the brush did to the officers with the guys on the steps.  They handcuffed the individuals.  The front part of the back lawn is cut.  On the day of the incident, the grass was not cut; on the day the photos in evidence were taken, the grass was cut.  There are speed bumps every 10 feet leading to the apartment building.  The police officers walked in front of the pool with the black bag.

Sasha Pagán Méndez testified that she has lived in the  Sabana Abajo Public Housing Project for seven years and was living there on May 25, 2006.  She lives at building 13, apartment 111, on the third floor.  She saw when agents arrive in official vehicles, some unmarked, a Cavalier, a Tecnica, and one looked like a Lincoln or Grand Prix.  There were one or two patrol cars.  She was on her balcony.  Looking at Exhibits D and C, she noted that she lived in the residence she pointed to in Exhibit D.[3]  The agents started searching around the area, and the other police intervened with the young men, the ones on the little stairs, including the three defendants, José Luis, Christian and Benjamín.  Exhibit K shows the steps.  There were seven guys on the steps.  They would spend time every day there fooling

---

[3]In Exhibit D, the upper left hand corner of the photo shows her apartment.

CRIMINAL 06-0174 (JAG)                    14

around.  Agents got near them to search them.  There were agents searching and other group searching the vicinity.  The officers then left them alone.  The other officers went to the brush.  Exhibit C  shows where she saw them go to the brush.  They found something.  A black bag.  They then signaled to the others, making a sign of cuffing wrists together, cuff to cuff, to arrest the others.  The seven were then arrested, and taken to the official van.  José Luis Alicea Cotto, one of the defendants was left behind.  They took him to his vehicle and searched the vehicle.  They found money that belonged to him.  Nothing else was found.  The agents got into the van and took José Luis to the van where the others were, the white van.  They were there when Alicea Cotto was taken there.

On cross-examination, Ms. Pagán said that she knows Alicea Cotto by sight, and knows his car.  Money was taken from his car.  She knows his wife who is her friend.  Referring to Exhibit D, she noted that the high grass was a distance and to her left from her building.  Exhibit D showed the high grass area correctly.  It is normally this way, although on the 25 of May, it did not look that way.  It had more grass.  The agents always go there and never beyond, because you can not go farther because of the concrete wall with barbed wire.  The grass can be higher, two to three inches high.  If there is a black bag, you could not see it, or it would be covered a bit.  The covered bag was three feet long, like a baseball bag, with Nike on it.  When the officers took it out from the high grass, it was closed.  There is a building between her building and the high grass areas.  Some of the defendants had their backs

CRIMINAL 06-0174 (JAG)                    15

towards her.  Some were standing and some sitting.  The police left them at peace.
The officer then came back to arrest them.  None of them moved at all and none
tried to leave after they were searched.  They stayed there.  They are always there
doing nothing.  I could read what the police were telling the guys because she read
lips.  The stairs are across the street in front of building 12, at about 20 feet from
her.  Also, she heard them because they yell everything they would say.  There were
more than 10 of the police. them.  The officers entered to the right of her balcony.
It obstructed the view to the entrance but one can see when they come into the
traffic circle.  There was no pool in front of her building.  The officers did not park
in front of her building.

　　　　José Miguel Sánchez Santiago, an officer of the Drug Division in Carolina for
two years, testified that on May 25, 2006, he was working at between 4:00 and 5:00
p.m. of that date, in an unmarked vehicle with Officer Vega.  It was a compact,
Chevrolet, Cavalier, green, headed toward Sabana Abajo Public Housing Project.
They had instructions from Sergeant Delgado to investigate a known drug point
operating in the Sabana Abajo Public Housing Project.  They went into the housing
project, and at a distance of about 60 feet, they saw three individuals, left to right,
one heavy set, wearing a white shirt, dark complexion.  The second was thin and
dark.  The third was white and heavy.  The second one gave paper currency to the
heavy one in the white t-shirt.  The heavy one reached into the trunk and from
underneath a shirt  pulled out a pistol and gave it to the first one.  He took it out of

CRIMINAL 06-0174 (JAG)                    16

an Nissan Armada, copper colored, with the hatch opened.  Referring to Exhibit 1, he circles in blue the place where the Nissan Armada was located in front of building 12.  The individuals were at the back side of the Nissan Armada.  Benny looked at it and put it in his waist band, covering it with his shirt.  The weapon was later seized, a 9mm Smith & Wesson, 5906, VCU9954.  It was later determined that it was stolen.  The officers got out of the vehicle, pistols in hand, called other police by radio, and told them to come in, that they were going to intervene.  The supporting police were at a strategic point ready to assist the two.  Three or four vehicles entered the complex including a white van.  Police arrived and helped the two to arrest them.  Benny and Christian were being arrested.  Out of right front pocket of Christian's pants, a pistol handle protruded, a 9mm Ruger P89, with an obliterated serial number.  Officer Vega said there was a rifle in the area of the trunk, underneath a shirt.  He could see the barrel of the rifle, in the trunk, under the shirt.  There were other guys about 10 feet away who were apprehended, but the prosecutor later said charges would not be brought against them.

At the drug division, the officer observed drugs which Officer Vega said he had gotten from the Nissan Armada.  On cross-examination, Officer Sánchez said that he got to the scene on May 25, 2006 at about 5:00 p.m., alone with Officer Vega in an unmarked vehicle.  There was no traffic at the entrance on the avenue at that time.  There are speed bumps.  They entered at about five m.p.h.  The officer had been there seven or eight times and usually drove slowly because of the bumps.  He saw from

CRIMINAL 06-0174 (JAG)                    17

50 to 60 feet away, the heavy man going into the trunk to get the weapon.  Benny

took the weapon and put it in his waistband, and handed over paper currency to the

heavy one.  The officer arrested Benny, Christian and four others, and made reports

about the arrest.  In these reports, Benny and Christian were at the back part of the

Nissan Armada.  The officer seized Benny's waist gun and Christian's front right

pocket gun.  He transported the Nissan Armada but did not search it. Cotto was in

the van when he took Benny and Christian to the van.  He did not know anything

about the search of the Nissan Armada.  From Benny, he seized a Ruger 9mm pistol,

UC mutilated,  grey in color.  He also seized a Smith and Wesson Model No. 5906,

VCU9994, 9mm.

Task Force Agent Samuel Sánchez Pérez testified that he has been an ATF task

force agent for two years, and works with the Municipal Police of Carolina.  On the

date of the incident, he participated in giving custody to the arrested individuals.

At the office of pretrial services, present were Task Force Agents Harrison Santiago

and Carlos Vázquez.  Officer Sánchez had custody of the defendants together with

the others, for several hours on May 26, 2006, at pretrial, and at the booking.  He

told the defendants that he did not know about the case but he knew that there were

two pistols.  He asked Christian how many weapons were occupied from him.  He

said one, the one with the obliterated serial number.  Benny said it (a weapon)

belonged to him but he did not know it was stolen.  The third defendant nodded his

head when asked if he had had a rifle seized from him.  Officers Santiago and

CRIMINAL 06-0174 (JAG)                    18


Vázquez were also present.  The witness did not tell the defendants he was a

policeman.  He was in the office of pretrial services.  He had an official i.d.

suspended from a black neck string.  They were in pretrial for more than one hour

and were handcuffed.

On cross-examination, the agent said that the (Miranda) rights were read in

the morning or the night before.  Every time the process is begun, the rights are

read. He knew that Harrison read the rights.  He was not present and did not know

when the rights were read to them.  The witness knew that the defendants new that

he was a cop.  He asked them questions and did not identify himself as an agent.

The witness said that he had no reason to read them the rights.  He did not get any

information he did not already know.  He did not interrogate them.  He knows that

they were Mirandized by Harrison.  He did not know if they had said that they did

not want to talk to anyone.  He did not know whether they wanted an attorney.  He

was with the defendants for three to four hours.  He did not think the statements

would advance the investigation. He was just curious although he knew that

weapons had been seized.  The statements were gotten in the afternoon.

## II.  DISCUSSION

### Search

I start with bedrock. A warrantless search is presumptively unreasonable

under the Fourth Amendment.  See California v. Acevedo, 500 U.S. 565, 593 (1991);

see also United States v. López, 380 F.3d 538, 543 (1st Cir. 2004), cert. and reh'g

CRIMINAL 06-0174 (JAG)                    19

denied, 543 U.S. (2005).  However, a warrantless search may be conducted if an exception to the search warrant requirement exists.  A search incident to an arrest has been recognized by the courts as a well settled exception to the search warrant requirement.  United States v. Robinson, 414 U.S. 218, 224 (1973); United States v. Doward, 41 F.3d 789, 791 (1st Cir. 1994).  The Supreme Court has held "that a search 'can be incident to an arrest only if it is substantially contemporaneous with the arrest and is confined to the immediate vicinity of the arrest.'"  Shipley v. California, 395 U.S. 818, 819-20 (1969) (quoting Stoner v. California, 376 U.S. 483, 486 (1964)).  The Supreme Court has established that the scope of a search incident to an arrest is the person of the arrestee and the area immediately surrounding him.  See  Knowles v. Iowa, 525 U.S. 113, 116 (1998); Chimel v. California, 395 U.S. 752, 760 (1969).  In relation to warrantless automobile searches, the Supreme Court, referring to the standard set forth in Chimel v. California, 395 U.S. at 762-63, established in New York v. Belton, 453 U.S. 454, 460 (1981), that the scope of a search incident to arrest extended to the interior of the passenger compartment of an automobile when the arrestee was an occupant of such vehicle.  Extending the scope of such a search even further, the Supreme Court applied Belton's rationale to an arrest in which the officer does not make contact with the individual until he has left the vehicle.  Thornton v. United States, 541 U.S. 615 , 615 (2004).  The Thornton case expanded the scope of a search incident to an arrest, making no distinction between when the arrestee was either an occupant or a recent occupant

CRIMINAL 06-0174 (JAG)                    20

of a vehicle.  Thornton v. United States, 541 U.S. at 622.  The Court observed that

for someone who is outside of his automobile, objects inside the vehicle may not be

readily accessible or in the immediate surroundings, as is the rationale offered in

Chimel for the relatively wide scope of a search incident to an arrest.  Id. at 623 n.3.

Still, the Court held that keeping an easily understood rule for police, not dependant

on estimates of each particular situation, justifies the broad generalized scope of a

search incident to an arrest stated in Belton.  Id. at 623.  In sum, the Court stated

that "[s]o long as an arrestee is [a] 'recent occupant' of a vehicle . . . , officers may

search that vehicle incident to the arrest."  Id. at 623-24 (footnote omitted).

        This  discussion  applies  if  one  adopts  the  scenario  presented  by  the

government.  If one adopts the scenario presented by the defendants, the law is

much different and the encounter between the police and the defendants begs for

sceptical consideration.  "[T]here are three types of citizen-police encounters:  (1)

consensual encounters, which involve a citizen's voluntary cooperation with an

official's non-coercive questioning and which are not seizures within the meaning

of the Fourth Amendment;" United States v. Seslar, 996 F.2d 1058, 1060 (1993);

see, e.g., Florida v. Bostick, 501 U.S. 429, 434 (1991); Michigan v. Chesternut, 486

U.S. 567, 574-76 (1988); "(2) investigative detentions or 'Terry stops,' which are

seizures [of limited scope and duration under the Fourth Amendment and] that are

justified only if articulable facts and reasonable inferences drawn from those facts

support a reasonable suspicion that a person [is engaged in criminal activity];

CRIMINAL 06-0174 (JAG)                 21

United States v. Seslar, 996 F.2d at 1060; Terry v. Ohio, 392 U.S. 1, 30 (1968); see, e.g., United States v. Sokolow, 490 U.S. 1, 7 (1989); United States v. Acosta-Colón, 157 F.3d 9, 14 (1st Cir. 1998); "and (3) arrests, which are seizures characterized by highly intrusive or lengthy detention and which require probable cause to believe that the arrestee has committed or is committing a crime."  United States v. Seslar, 996 F.2d at 1060; see Hayes v. Florida, 470 U.S. 811, 815-16 (1985); United States v. Lambert, 46 F.3d 1064, 1067 (10th Cir. 1995); United States v. Seslar, 996 F.2d 1058, 1060 (10th Cir. 1993); United States v. Bloom, 975 F.2d 1447, 1451 (10th Cir. 1992).

Under one scenario, it is clear in this case that the law enforcement officers may have barely had the requisite level of suspicion to support a Terry-stop. However, this case squarely presents issues of credibility which skirt any Fourth Amendment issues.  The government's version of the facts places the weapons and drugs in and near the Nissan Armada from the initial contact with the arrestees. The defense's theory locates all of the weapons and drugs in a Nike black bag located in a grassy area at a distance from where the government's version of facts occurred.  If I assume the first scenario, the question appears to be at first blush a search and seizure issue.  However, there is no issue of exigent circumstances, warrantless search or even Terry stop.  Rather, the defendants bring another set of facts which are at loggerheads with the government's version.  Indeed, if the defendants' version is adopted, then it is difficult to detect a suppression issue, since

CRIMINAL 06-0174 (JAG)                    22

the black bag was seized in an area where none of the defendants had an expectation of privacy, in plain view of policemen who had a right to be where they were at the time of the seizure.  Nor is there an allegation that the defendants had either a possessory or proprietary interest in the contents of the Nike bag.  In short, the issue is not how the government's version developed but if it developed at all.  The defense argues that it did not.  The factual versions of the parties allow a fact finder to look askance at the testimony of one side and accept the other and I am not in a position to make such a resolution, a resolution which belongs to a jury.  The United States yet has the right not to have this case pretried at evidentiary hearing.  If I disagree with the witnesses for the government, and agree with the defense, then the determination is that there was no probable cause to arrest the three defendants.  Indeed, the evidence would require that I acquit were I the trier of fact.  On the other hand, if I give credibility to the government's version, the evidence points to a greater extent to conviction.

Indeed, if the weapons were seized as the defendants allege they were, where is their standing to move to suppress the evidence? Their theory is that the weapons do not belong to them.  They have no possessory or proprietary interest in the evidence seized.  Theirs is a defense theory, not a suppression theory.  The suppression motion as to the physical evidence should therefore be denied.

IN CUSTODY INTERROGATION

CRIMINAL 06-0174 (JAG)                23

Once "an individual is taken into custody and before interrogation, <u>Miranda</u> requires that the individual be advised:  that  he has the right to remain silent; that anything he says may be used against him in court; that he has the right to consult an attorney before being asked questions; that the attorney may be present during questioning; and that if he cannot afford an attorney, one will be appointed for him if he wishes." <u>United States v. García</u>, 983 F.2d 1160, 1169 (1st Cir. 1993) (citing <u>Miranda v. Arizona</u>, 384 U.S. 436, 444 (1966)). "[T]he prosecution may not use the [defendant's] statements . . . [issuing] from custodial interrogation . . . unless it demonstrates the use of [these] procedural safeguards effective to secure the privilege against self-incrimination." <u>United States v. Browne</u>, 891 F.2d 389, 394 (1st Cir. 1989) (quoting <u>Miranda v. Arizona</u>, 384 U.S. at 444) .

After being advised of his rights, the accused may waive his right to remain silent and his right to counsel, and respond to interrogation.  <u>See</u> <u>Edwards v. Arizona</u>, 451 U.S. 477, 484 (1981); <u>North Carolina v. Butler</u>, 441 U.S. 369, 372-76 (1979); <u>United States v. García</u>, 983 F.2d at 1169.  "[T]he government must show by a preponderance of the evidence . . . that an individual's waiver was voluntary and . . . a "knowing and intelligent relinquishment or abandonment of a known right or privilege" has been made.  <u>United States v. Eaton</u>, 890 F.2d 511, 516 (1st Cir. 1989 (quoting <u>Edwards v. Arizona</u>, 451 U.S. at 482).

In order for the waiver to be valid, it must be "knowing and intelligent, given the totality of the circumstances and the facts surrounding the particular case,

CRIMINAL 06-0174 (JAG)                    24

'including the background, experience, and conduct of the accused.'" <u>United States</u> <u>v. García</u>, 983 F.2d at 1169 (quoting <u>United States v. Butler</u>, 441 U.S. at 374-75); <u>see also</u> <u>Edwards v. Arizona</u>, 451 U.S. at 482-83.  Voluntariness is determined by "whether the will of the defendant had been overborne so that the statement was not his free and voluntary act . . . . " <u>Bryant v. Vose</u>, 785 F.2d 364, 367-68 (1st Cir. 1986) (quoting <u>Procunier v. Atchley</u>, 400 U.S. 446, 453 (1971)); <u>see also</u> <u>United</u> <u>States v. Browne</u>, 891 F.2d at 393.  "[T]he factors to be considered include 'the type and length of questioning, the defendant's physical and mental capabilities, and the government's method of interrogation.'" <u>United States v. Browne</u>, 891 F.2d at 393 (quoting <u>United States v. Alvarado</u>, 882 F.2d 645, 649 (2d Cir. 1989)).

　　　　<u>Miranda</u> requires an officer to go further than merely asking the accused if he understands his rights; the officer must "make sure that the accused, knowing his rights, voluntarily relinquishes them." <u>United States v. Porter</u>, 764 F.2d 1, 7 (1st Cir. 1985); <u>United States v. Christian</u>, 571 F.2d 64, 67-68 (1st Cir. 1978); <u>see also</u> <u>United States v. García</u>, 983 F.2d at 1169.

　　　　Task Force Agent Sánchez testified that he wanted to know something about the case, that he was curious, and that he did not expect his questioning to advance the investigation because everything was already known.  He even said there was no interrogation.  To determine if an interrogation had taken place, there must be a finding that the law enforcement officers engaged in express questioning or its functional equivalent which "occurs only when police conduct is 'reasonably likely

CRIMINAL 06-0174 (JAG)                    25

to elicit an incriminating response from the suspect.'" United States v. Genao, 281 F.3d 305, 310 (1st Cir. 2002) (quoting Rhode Island v. Innis, 446 U.S. 291, 301 (1980)). The evidence presented at the suppression hearing clearly indicates that the defendants were arrested and handcuffed. While the defendant was in a neutral setting, the Pretrial Services Office of this court, there were law enforcement officers present. The circumstances require that I find that there was custodial interrogation or its functional equivalent. The defendants were not free to leave, they were handcuffed, and they were asked incriminating questions by a person not clearly identifying himself as a police office. The officer did not think the defendants' statements would advance the investigation, but eliciting incriminating statements easily have a tendency to advance a prosecution. The officer said he had no reason to Mirandize the defendants. He said that every time the process is begun, the rights are read. That did not happen here. Harrison read the rights, in the morning or the evening before. The evidence related to how it is that he knows that the defendants were read the Miranda warnings is outlined above. Only upon straightforward questioning did he say that Harrison told him that they were Mirandized. Before that, he simply knew because that is the process at the station. The government must show by a preponderance of the evidence that an individual's waiver was voluntary, and a knowing and intelligent relinquishment of a known right or privilege has been made. The testimony of the task force agent leaves me with the uncertainty of when the Miranda warnings were made, and what they

CRIMINAL 06-0174 (JAG)                    26

consisted of.  The government has clearly not met its burden of showing that the waiver of the right to remain silent was voluntary.  To the contrary, the government has proven that the three defendants who had previously exercised their right to remain silent, all made incriminating statement to someone at the Pretrial services Office who did not tell them who he was, what he was, or what their rights are.  The assumption of the defendants' knowing he was a policeman because he had a badged card hanging from his neck is generous.  "[T]his Court should not be ignorant as judges of what we know as men." Watts v. Indiana, 338 U.S. 49, 52 (1949).  This was a custodial interrogation, not a naive request born of rote curiosity.  The credible evidence that Miranda warnings were given hours before or the day before, and that rights were waived by all three defendants was not even ethereal.  If the rights were waived, statements would have inevitably been taken beyond the booking information at which this task force agent was present.  If the rights were not waived, then the rights had been exercised and the questioning should not have taken place in the absence of further Mirandizing.  In any event, no one knows what Harrison did except Harrison.

### III.  CONCLUSION

In view of the above, I recommend that the suppression motions be denied except for the incriminating statements made at the United States Pretrial Services Office.  I recommend that those statements be suppressed.

CRIMINAL 06-0174 (JAG)                    27


Under the provisions of Rule 72(d), Local Rules, District of Puerto Rico, any party who objects to this report and recommendation must file a written objection thereto with the Clerk of this Court within ten (10) days of the party's receipt of this report and recommendation.  The written objections must specifically identify the portion of the recommendation, or report to which objection is made and the basis for such objections.  Failure to comply with this rule precludes further appellate review.  See Thomas v. Arn, 474 U.S. 140, 155 (1985); Davet v. Maccorone, 973 F.2d 22, 30-31 (1st Cir. 1992); Paterson-Leitch Co. v. Mass. Mun. Wholesale Elec. Co., 840 F.2d 985 (1st Cir. 1988); Borden v. Sec'y of Health & Human Servs., 836 F.2d 4, 6 (1st Cir. 1987); Scott v. Schweiker, 702 F.2d 13, 14 (1st Cir. 1983); United States v. Vega, 678 F.2d 376, 378-79 (1st Cir. 1982); Park Motor Mart, Inc. v. Ford Motor Co., 616 F.2d 603 (1st Cir. 1980).

At San Juan, Puerto Rico, this 13th day of November, 2006.


                                        S/ JUSTO ARENAS
                                    Chief United States Magistrate Judge